## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TERENCE TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-1336-JES |
| | ) | |
| WEXFORD HEALTH | ) | |
| SOURCES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>SUMMARY JUDGMENT ORDER</u>

Plaintiff, Terence Taylor, who is an inmate within the Illinois Department of Corrections

("IDOC") and represented by counsel, filed a seven-count second amended complaint [94] on

June 17, 2016, in the Northern District of Illinois against the following defendants: (1) Wexford

Health Sources, Inc. ("Wexford, Inc."), Cynthia Garcia, LaTanya Williams, and Meghan Foley

(collectively, "Wexford Defendants"); (2) Saleh Obaisi, who is now deceased and has been

substituted with the administrator of his estate, Ghaliah Obaisi ("Estate Defendant"); and (3)

Tarry Williams, Michael Magana, Michael Lemke, Naveen Nagpal, Royce Brown-Reed, Victor

Calloway, Dominic M. Griffin, Jenny McGarvey, Randy Malkowski, Tralon Durrett, Guy Pierce,

Mary Ellen Grennan, Kimberly Kelley, Krisi Eschleman, and Rebecca Buczkowski (collectively,

"IDOC Defendants"). On August 24, 2016, Judge Sara Ellis, of the Northern District of Illinois,

ordered that the case be transferred to the Central District of Illinois. On September 12, 2016, the

case was added to this Court's docket.

Now before the Court for consideration are three motions for summary judgment, one

filed by Wexford Defendants [155], one filed by Estate Defendant [157], and one filed by IDOC

Defendants [156]. Plaintiff has responded to each motion [163, 162, 164]. A reply has been filed

by Wexford Defendants [168] and Defendant Obaisi [167] but not IDOC Defendants. Based on the parties' pleadings, depositions, affidavits, and other supporting documents filed with the Court, Wexford Defendants' motion for summary judgment is GRANTED, Estate Defendant's motion for summary judgment is GRANTED, and IDOC Defendants' motion for summary judgment is GRANTED in part, DENIED in part, and RESERVED in part.

## I. BACKGROUND AND PRELIMINARY MATTERS

This case arises out of an attack on Plaintiff by a fellow inmate at Stateville Correctional Center ("Stateville") on June 25, 2013. Plaintiff alleges that some defendants allowed the fellow inmate to severely beat Plaintiff and that other defendants denied Plaintiff medical attention for the injuries he sustained in the attack, including persistent leg and back pain.

On October 7, 2015, Plaintiff filed a first amended complaint. On June 13, 2016, Judge Ellis dismissed the *Monell* claim and *respondeat superior* claim against Defendant Wexford, Inc. On June 17, 2016, Plaintiff filed a second amended complaint that included the dismissed claims. On July 26, 2016, Judge Ellis entered a text order dismissing the previously dismissed claims and also dismissing the indemnification claim against Wexford, Inc.

In addition to the defendants identified in the first paragraph of this order, Plaintiff named Doretta O'Brien, an assistant warden at Stateville, as a defendant in his second amended complaint. Defendant O'Brien has not been served, but on July 1, 2016, Assistant Attorney General Jennifer M. Lutzke entered an appearance on O'Brien's behalf, and on July 22, 2016, Assistant Attorney General Deborah J. Baker also entered an appearance on O'Brien's behalf. On July 24, 2018, Assistant Attorney General Erik Johnson moved to substitute as counsel in place of Attorneys Lutzke and Baker because Lutzke and Baker are no longer with the Illinois Attorney General's Office. Attorney Johnson moved to substitute as counsel for IDOC

Defendants but not for O'Brien, and Johnson did not address the claims against O'Brien in IDOC

Defendants' motion for summary judgment. The Court does not know if this omission was an

oversight or intentional. Therefore, the Court directs Attorney Johnson to advise the Court within

fourteen days of the status of O'Brien's representation.

Plaintiff also named in his second amended complaint the following unknown

individuals: Correctional Officer John Doe 1, Jane Roe, Unknown Wexford Health Sources, Inc.

Employees, Unknown Health Care Employees, and Unknown Illinois Department of Corrections

Employees. Discovery in this case closed on February 28, 2018, and Plaintiff has not moved to

substitute real parties for the unknown parties. Therefore, the Court now dismisses these

defendants.

Plaintiff also named Correctional Officer Johnson as a defendant, but Johnson has not

been served nor has an attorney entered an appearance on Johnson's behalf. Therefore, the Court

dismisses Johnson as a party to this case.

Plaintiff named Medtec Bobby in his original complaint and Medical Technician Bobby

in his first amended complaint. In his second amended complaint, Plaintiff explained that

Defendant Naveen Nagpal is the person known to Plaintiff as "MedTech Bobby." Therefore, the

Court dismisses Medtec Bobby and Medical Technician Bobby as parties to this case.

Finally, in his original complaint, Plaintiff named Major Magarvie as a defendant. This

party has since been identified as Major Jenny McGarvey and added as an additional defendant.

Therefore, the Court dismisses Major Magarvie as a party to this case.

As modified by these orders, then, Plaintiff's second amended complaint alleges the

following claims, grouped by the sets of defendants the claims are against:

| Count I: | Denial of Medical Care (Eighth Amendment) | |
|---|---|---|
| Count II: | Failure to Intervene (Eighth Amendment) | |
| | Wexford Defendants: | LaTanya Williams, Garcia, and Foley |
| | Estate Defendant: | Obaisi |
| | IDOC Defendants: | Tarry Williams, Magana, Lemke, Nagpal, Brown-Reed, Calloway, Grennan, Kelley, Eschleman, Buczkowski, and Pierce |
| | Other Defendant: | O'Brien |
| | | |
| Count III: | Failure to Protect (Eighth Amendment) | |
| Count IV: | Failure to Intervene (Eighth Amendment) | |
| | IDOC Defendants: | McGarvey, Durrett, Malkowski, and Griffin |
| | | |
| Count IV:[1] | Intentional Infliction of Emotional Distress | |
| | Wexford Defendants: | LaTanya Williams and Wexford, Inc. |
| | Estate Defendant: | Obaisi |
| | IDOC Defendants: | McGarvey, Durrett, Malkowski, and Nagpal |
| | | |
| Count VI: | Indemnification | |
| | IDOC Defendants: | All |

The only claims being addressed on summary judgment are the medical care claims (Counts I and II) by Wexford Defendants, Estate Defendant, and IDOC Defendants and the intentional infliction of emotional distress claim (Count IV) by Wexford Defendants and Estate Defendant. Plaintiff informs the Court that he does not oppose Wexford Defendants' motion for summary judgment as it relates to Defendants Garcia and Foley. Therefore, the Court grants summary judgment to Defendants Garcia and Foley.

## II. MOTION TO STRIKE

Wexford Defendants move the Court to strike portions of paragraphs 12–16 of Plaintiff's declaration, which rely on inadmissible hearsay, and to strike Plaintiff's additional material facts 17, 19, and 21, which also rely on inadmissible hearsay.

"[A] court may consider only admissible evidence in assessing a motion for summary judgment." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 301 (7th Cir. 2011). No rule exists that

---

[1] Plaintiff includes two claims labeled as Count IV in his second amended complaint.

allows a motion to strike portions of an affidavit or material facts during the summary judgment procedure. *See, e.g.*, *In re 3RC Mech. & Contracting Servs., LLC*, 505 B.R. 818, 823 (Bankr. N.D. Ill. 2014); *see also Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 727 (7th Cir. 2006) ("[T]here is no provision for a judicial blue pencil. . . . Motions may be proper despite the lack of a specific rule . . . [and] the court sometimes strikes entire briefs . . . . But *editing* a brief? That's a different kettle of fish."). "[M]otions to strike are usually discouraged because of their tendency to multiply the proceedings and prolong briefing." *Smith v. Bray*, 681 F.3d 888, 903 (7th Cir. 2012).

Under Rule 56 of the Federal Rules of Civil Procedure, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P 56(c)(2). Accordingly, "[t]he proper way to contest the opposing party's statement of facts . . . is a brief in response or reply, not a motion to strike." *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Graphic Packaging Int'l, Inc.*, No. 06-C-1188, 2007 WL 2288069, at *3 (E.D. Wis. Aug. 4, 2007) (citing *Custom Vehicles*, 464 F.3d at 727). Therefore, Wexford Defendants' motion to strike [170] is denied, but the Court will nonetheless address their arguments, construing them as objections under Rule 56.

Wexford Defendants identify a number of hearsay statements offered by Plaintiff in his declaration and additional material facts. The Court, however, will address only the hearsay statements Plaintiff relies on in the argument sections of his responses to Defendants' motions for summary judgment. These hearsay statements relate to a diagnosis of the underlying cause of Plaintiff's persistent leg pain.

In opposing Defendants' motions for summary judgment, Plaintiff argues that
approximately one year after the attack, Dr. Andrew Tilden, who is not a party to this case,
diagnosed the source of Plaintiff's leg pain as an untreated broken leg. To support his argument,
Plaintiff relies on his deposition testimony and declaration, in which he testified about his
discussion with Dr. Tilden regarding the x-ray images taken of Plaintiff's leg. According to
Plaintiff, Dr. Tilden told Plaintiff "his leg was cracked and that he could have hurt muscles in his
leg from being attacked." (Pl.'s Resp. to Wexford Mot., AMF ¶ 19, ECF No. 163.) Dr. Tilden
also told Plaintiff "it was too late to do anything about his leg" except "to stop doing activities
and let it heal." (*Id.*)

Wexford Defendants argue that Dr. Tilden's statements to Plaintiff are inadmissible
hearsay and must not be considered by the Court on summary judgment. *See Cairel v. Alderden*,
821 F.3d 823, 830 (7th Cir. 2016) ("If the evidence is inadmissible hearsay, the courts may not
consider it [on summary judgment]."). In response, Plaintiff argues that Dr. Tilden is an
employee and agent of Defendant Wexford, Inc. and as such, Dr. Tilden's "statements are . . . not
hearsay under Fed. R. Evid. 801(d)(2)(D)." (Pl.'s Resp. to Mot. to Strike ¶ 5, ECF No. 172.)
Plaintiff presents evidence that Dr. Tilden is an employee and agent of Wexford, Inc. (*Id.*, Ex. 1,
ECF No. 172-1.)

Under the Federal Rules of Evidence, a statement is not hearsay if the "statement is
offered against an opposing party and . . . was made by the party's agent or employee on a matter
within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). For a
declarant's statement to be admissible under this rule, the declarant must be the "party's agent or
employee." *Id.* The "party" to which the rule refers is the opposing party against whom the

statement is offered. Thus, the rule requires the declarant to be the agent or employee of the party against whom the statement is offered.

When offered against Defendant Wexford, Inc., Dr. Tilden's hearsay statements are arguably admissible because they were "made by [Wexford, Inc.'s] agent or employee." *See id.* Therefore, the Court will consider Dr. Tilden's statements when offered against Wexford, Inc. The Court, however, will not consider Dr. Tilden's statements when offered against any other defendant because Plaintiff has not shown that Dr. Tilden acted as an agent or employee of any other defendant.

### III. MATERIAL FACTS

**A.   Inmate Attack on Plaintiff and Initial Medical Care**

On June 25, 2013, a correctional officer at Stateville escorted Plaintiff to be heard before the Adjustment Committee on a potential disciplinary infraction. (Pl.'s Dep. 30:3–33:9, ECF No. 155-1.) Plaintiff was placed in a shower room, which was being used as a holding cell just outside of the Adjustment Committee hearing room. (*Id.*) When Plaintiff arrived at the holding cell, there were five or six inmates inside the cell, including inmate Andrew McKissick. (*Id.* at 34:7–10; 40:22–41:2.) Plaintiff and the other inmates were all cuffed behind the back, except for McKissick who had one hand uncuffed. (*Id.* at 35:23–37:7, 41:3–14.) Almost immediately after Plaintiff entered the holding cell, McKissick attacked Plaintiff. (*Id.* at 41:15–45:19.) As McKissick began punching Plaintiff, Plaintiff lunged out of the holding cell door. (*Id.*) Plaintiff and McKissick ended up on the gallery floor just outside of the holding cell, where McKissick continued to punch and "stomp" Plaintiff. (*Id.* at 48:1–24.) Plaintiff saw correctional officers running from the incident as he was going in and out of consciousness. (*Id.* at 48:17–24.)

Plaintiff cannot remember how much time elapsed as McKissick was assaulting him, but he recalls waking up with correctional officers restraining him on the ground with knees in Plaintiff's back. (*Id.*) Correctional staff transported Plaintiff to be seen by medical personnel for his injuries. (*Id.* at 52:16–55:6.) Defendant Nagpal, a medical technician, evaluated Plaintiff and noted a superficial laceration/abrasion to Plaintiff's right eyelid, a superficial laceration/abrasion to the right leg, and complaints of headache and back, stomach, chest, and bilateral leg pain. (Offender Injury Report, ECF No. 156-1.) Nagpal took Plaintiff to see a "doctor for further evaluation, treatment, and management." (Nagpal Dep. 35:14–19, ECF No. 155-6.)

Afterwards, Plaintiff was taken back to the holding cell for a few seconds and then appeared before the Adjustment Committee. (Pl.'s Dep. 55:2–5, 56:3–57:21.) After the hearing, Plaintiff was escorted to the Health Care Unit ("HCU"), where a nurse prescribed pain medication and sent Plaintiff back to his cell. (*Id.* at 57:22–25, 59:13–16.)

After the attack, Plaintiff "was in serious pain." (Pl.'s Decl. ¶ 4, ECF No. 165-1.) Plaintiff states, "I had blood and dark liquid in my urine and was in constant pain in both my back and my leg." (*Id.*) Plaintiff states that the pain medication he was prescribed did not stop him from being in pain. (*Id.*) Plaintiff further states, "I had serious difficulty walking or moving. There would be times that I could not even get out of bed." (*Id.*) Plaintiff states that he complained "almost every day" to Defendant Nagpal that he "was still in pain." (*Id.* ¶ 6.) Plaintiff asked Nagpal to be placed on the sick call list and gave Nagpal sick call request forms, but Plaintiff "was very rarely taken to sick call." (*Id.*)

Plaintiff states that around one or two weeks after the attack, he wrote at least two letters to Defendant Lemke, Stateville's warden, and placed the letters in the institutional mail. (Pl.'s Dep. 148:1–149:8.) Plaintiff informed Lemke "about what happened to [him]" and that he

"wasn't receiving medical attention." (*Id.* at 149:17–150:4.) Plaintiff "was looking for [Lemke] to do something about it." (*Id.*)

## B.   Subsequent Medical Care at Stateville

On July 17, 2013, Plaintiff saw a nurse on sick call for back pain and was given ibuprofen. (Williams Decl. ¶ 6, ECF No. 155-4.) On July 25, 2013, Plaintiff saw a nurse on sick call for low back pain and was advised to continue his current medication, use an analgesic balm, avoid lifting and strenuous activity, and return in one week. (*Id.*) On August 13, 2013, Plaintiff again saw a nurse on sick call. (*Id.* ¶ 7.) Plaintiff complained about the injury to his back during the attack and requested to be re-scheduled to see a physician. (*Id.*) The nurse recommended heat and cold packs and gave Plaintiff analgesic balm. (*Id.*) Plaintiff was scheduled for sick call on October 16, 2013, which was rescheduled to October 23, 2013. (*Id.*) Plaintiff was seen during sick call on October 30, 2013, and referred to see a physician. (*Id.* ¶ 8.)

Defendant LaTanya Williams is a physician's assistant licensed to practice in the State of Illinois and employed by Wexford, Inc. as a physician's assistant at Stateville. (*Id.* ¶ 1.) According to the medical records, Plaintiff saw Williams on November 11, 2013, for complaints of low back pain off and on since his injury on June 25, 2013. (*Id.* ¶ 8.) On examination, Plaintiff reported tenderness to the left paraspinal muscles to palpation that extended down the posterior thigh. (*Id.* ¶ 9.) Williams noted a full range of motion with minimal discomfort. (*Id.*) Williams assessed Plaintiff with chronic low back pain. (*Id.*)

Plaintiff states that during the examination he told Williams "[his] leg and [his] back hurt, and [he] was urinating blood." (Pl.'s Dep. 76:13–24.) Williams responded that "she was going to put [Plaintiff] in to get an x-ray" but that Plaintiff could "only go in for one issue at a time." (*Id.* at 77:2–5.) Williams told Plaintiff, "[W]e can only handle one issue at a time, so what issue do

you choose?" (*Id.* at 77:10–16.) Plaintiff states, "I told [Williams] the bigger problem I was having was my leg, but she was already talking to me about my back first," so Williams told Plaintiff, "That's what we'll be getting an x-ray of." (*Id.* at 78:17–25.)

After the examination, Defendant Williams ordered an x-ray of Plaintiff's lumbosacral spine, provided an analgesic balm, ordered pain medication, advised Plaintiff to decrease physical activity to "as tolerated," and requested that Plaintiff return in one month. (Williams Decl. ¶ 8.)

Dr. Saleh Obaisi was a physician licensed to practice medicine in the State of Illinois and was employed as the medical director at Stateville from 2012 until his death in late 2017. (Obaisi Dep. 9:3–8, 95:8–10, ECF No. 157-1; Suggestion of Death, ECF No. 145.) Dr. Obaisi reviewed the radiology report of Plaintiff's lumbar spine x-ray ordered by Defendant Williams. (Obaisi Dep. 69:7–71:9, 101:6–102:11.) The radiology report indicated, "No bone or joint pathology. Normal appearing sacroiliac [and] hip joints." (IDOC Rs. 83, ECF No. 157-6.)

On December 11, 2013, Defendant Williams saw Plaintiff for a follow-up appointment on his lumbar spine x-ray, which showed no abnormality. (Williams Decl. ¶¶ 10–11.) Williams advised Plaintiff to return to normal activity and to come back if he had any problems. (*Id.* ¶ 11.) Williams did not see Plaintiff again after December 11, 2013. (*Id.* ¶ 12.) Plaintiff was seen on nurse sick call on April 15 and 24, 2014, for complaints of back pain, and on May 7, 2014, Plaintiff transferred from Stateville to Pontiac Correctional Center ("Pontiac"). (*Id.*)

Plaintiff states that he saw Defendant Williams "several times" at Stateville and that each time, he complained to Williams that his "leg and back were hurting." (Pl.'s Decl. ¶ 7.) Plaintiff states that Williams "did not order an x-ray for [his] leg or do anything else to help [him] except prescribe [him] pain pills." (*Id.*) Plaintiff states that the pain medication soothed his pain for a

minute so he could go to sleep, but when he woke up, the pain would return. (Pl.'s Dep. 79:22–80:4.) Plaintiff further states that "on more than one occasion," Williams told Plaintiff that Stateville has "a policy of only treating one complaint at a time, so that [Williams] could only handle one thing [Plaintiff] was complaining about at [a] time." (Pl.'s Decl. ¶ 7.)

On an unknown date after Plaintiff saw Defendant Williams, Plaintiff saw Defendant Lemke in person and told Lemke that his back and leg was still in pain. (Pl.'s Dep. 151:22–152:17.) Lemke told Plaintiff that he would look into it. (*Id.*) Plaintiff states that he was not seen again by medical staff after he spoke with Lemke. (*Id.*)

Plaintiff states that he "remember[s] seeing Dr. Obaisi at Stateville and complaining to [Dr. Obaisi] about [his] back and leg." (Pl.'s Decl. ¶ 14.) Dr. Obaisi gave Plaintiff medication for his back and told him "to give it time." (*Id.*) Plaintiff states that Dr. Obaisi and Defendant Williams told him he might have arthritis in his back. (*Id.*) Plaintiff further states, "When I tried to complain about my leg and asked for an x-ray, [Dr. Obaisi] told me words to the effect that I was there for my back." (*Id.*) Dr. Obaisi states that medical visits are "designed to address one medical issue." (Obaisi Dep. 37:16–38–18.) Dr. Obaisi states that an inmate's "main complaint . . . has to be addressed." (*Id.*) "Then, if the physician wants to address more issue[s], that's up to him." (*Id.*)

## C.    Medical Care at Pontiac

On May 14, 2014, medical staff at Pontiac saw Plaintiff for an initial consultation. (Foley Decl. ¶ 5, ECF No. 155-7.) On August 24, 2014, Plaintiff was seen on sick call for complaints of heartburn/indigestion and was provided antacids. (*Id.* ¶ 6.) On October 1, 2014, Plaintiff was seen in regular asthma clinic. (*Id.* ¶ 7.)

On November 11, 2014, Plaintiff complained to medical staff that he had irritation and drainage in his left eye. (*Id.* ¶ 8.) Plaintiff was referred to a physician. (*Id.*) On November 16, 2014, Plaintiff saw Dr. Tilden and complained of a broken bone just below the right knee. (*Id.*) Dr. Tilden ordered an x-ray of Plaintiff's right proximal tibia. (*Id.*) On November 18, 2014, Dr. Tilden followed-up with Plaintiff on the x-ray results. (*Id.* ¶ 9.) In the radiology report, the radiologist noted, "There is a well corticated ossific density adjacent to the tibial tuberosity suggesting an old ununited fracture fragment or secondary ossification center. No acute fracture, dislocation or bony abnormality." (Med. Rs. 284, ECF No. 155-8.) The report does not indicate how long ago the fracture fragment or ossification center developed. (*Id.*) Upon examination, Dr. Tilden noted tenderness to the medial aspect of Plaintiff's right knee. (Foley Decl. ¶ 9.) Dr. Tilden provided pain medication and advised Plaintiff to return to the clinic as needed. (*Id.*)

On December 18, 2014, Plaintiff saw Dr. Tilden for abdominal pain, nausea, vomiting, and fever. (*Id.* ¶ 10.) Dr. Tilden sent Plaintiff to the local hospital to rule out peritonitis and appendicitis. (*Id.*) Plaintiff was diagnosed with viral gastritis and received IV fluids and medication. (*Id.*)

On March 5, 2015, Plaintiff was seen during sick call after requesting a Motrin refill from medical staff. (*Id.* ¶ 12.) The physician assistant noted that Plaintiff's right knee had no joint deformity, erythema, or edema. (*Id.*) The physician assistant provided pain medication. (*Id.*) On August 17, 2015, Plaintiff complained of low back pain and was educated on range of motion exercises for his back and advised on a warm, moist compress, if needed. (*Id.* ¶ 14.) On August 23, 2015, Plaintiff was seen for a headache and given ibuprofen. (*Id.* ¶ 15.) On September 6, 2015, Plaintiff was seen on nurse sick call for complaints of back pain for five days. (*Id.* ¶ 16.)

Plaintiff was provided ibuprofen and advised on activity modification per the nursing treatment protocol. (*Id.*)

On September 7, 2015, Plaintiff reported to a certified medical technician ("CMT") that he was talking at the front of his cell and felt pain below his leg below the knee. (*Id.* ¶ 17.) The CMT referred Plaintiff to the doctor. (*Id.*) On November 8, 2015, Plaintiff asked a CMT to put him in to see the doctor, which the CMT did. (*Id.* ¶ 18.) On November 11, 2015, Plaintiff saw Dr. Tilden. (*Id.* ¶ 19.) Dr. Tilden noted a history of a right knee injury with a request for a prescription refill. (*Id.*) Dr. Tilden noted a full range of motion with no tenderness or edema, assessed a history of an old fracture with no acute fracture, and prescribed pain medication. (*Id.*)

On December 30, 2015, Plaintiff complained to a CMT of left leg pain due to his right leg giving out, causing him to twist his left leg. (*Id.* ¶ 20.) The CMT referred Plaintiff to sick call in the cell house. (*Id.*) On January 4, 2016, Plaintiff saw a physician assistant for complaints of left leg pain. (*Id.* ¶ 21.) The physician assistant assessed Plaintiff with left lower extremity/knee pain and prescribed pain medication. (*Id.*) On February 4, 2016, Plaintiff complained to a CMT of continued leg pain. (*Id.* ¶ 23.) On February 8, 2016, Plaintiff saw a physician assistant for recurrent left knee pain and renewal of pain medication. (*Id.* ¶ 24.) The physician assistant renewed Plaintiff's pain medication and advised Plaintiff to start regular exercise. (*Id.*) On February 19, 2016, Plaintiff saw Dr. Tilden for an annual physical examination. (*Id.* ¶ 25.) Dr. Tilden ordered an x-ray of Plaintiff's left knee. (*Id.*) The radiology report was unremarkable, showing no acute fracture or dislocation. (*Id.* ¶ 26.)

On June 7, 2016, Plaintiff presented at nurse sick call with complaints of back pain and was provided ibuprofen. (*Id.* ¶ 27.) On September 28, 2016, Plaintiff transferred from Pontiac to Menard Correctional Center ("Menard"). (*Id.* ¶ 29.)

Plaintiff states that while he was at Pontiac, he asked Defendants Eschleman and Buczkowski that he "be allowed to go to [the HCU] to have someone look at [his] leg and back." (Pl.'s Decl. ¶ 10.) Plaintiff states that one time he collapsed on the floor of his cell because his "leg was not working and [he] could not move." (*Id.* ¶ 12.) Defendant Buczkowski came to Plaintiff's cell and spent about thirty minutes "just telling [Plaintiff] to get up into [his] bed." (*Id.*) Plaintiff requested to go to the HCU because he was in pain. (*Id.*) Buczkowski told Plaintiff she would put him on the sick call list for the next day, but the next day, Plaintiff was not taken to the HCU. (*Id.*)

Plaintiff states that he complained "many times" to Defendant Eschleman about his back and leg. (*Id.* ¶ 13.) Eschleman responded by shouting at Plaintiff from down the cellhouse that he did not need to complain to her every time about this, that she was not a doctor, and that he knew how to submit a health care slip. (*Id.*)

Defendant Buczkowski states that Pontiac has the following policy for handling inmate complaints on two different medical issues: The CMT will schedule the inmate for one issue and will ask the inmate what issue he wants to be seen about first. If the inmate wants to be seen for the second issue, the inmate would have to submit another written request and a separate money voucher for the second issue. (Buczkowski Dep. 46:16–47:2, ECF No. 165-5.)

**D.     Grievances**

Plaintiff filed a grievance on June 25, 2013, the day of the incident, complaining that Defendants Griffin, McGarvey, Malkowski, and Durrett failed to protect Plaintiff from inmate McKissick's attack. (Grievance, June 25, 2013, ECF No. 156-4.) Plaintiff did not grieve any issues related to his medical care in this grievance. (*Id.*)

On July 15, 2013, Plaintiff submitted a second grievance, complaining about the lack of medical care for the injuries he sustained during the attack. (Grievance, July 15, 2013, ECF No. 165-2.) Plaintiff wrote in the grievance that he complained to "med tec Bobby" and "other unknown nurses" that he could barely walk and that it felt like his leg was broken, but they told Plaintiff that nothing was wrong with him. (*Id.*)

On October 30, 2014, while incarcerated at Pontiac, Plaintiff filed another grievance, complaining that he had not received any medical care since arriving at Pontiac on April 5, 2014. (Grievance, Oct. 30, 2014, ECF No. 156-5.) Plaintiff wrote in the grievance that he had sharp pains and that it felt like his leg was broken. (*Id.*) Plaintiff wrote that he complained to "nurses and med tect" but they did not provide him medical care. (*Id.*)

## IV. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a genuine dispute through specific cites to admissible evidence or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(1). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint but instead must point to admissible evidence in the record to show that a genuine dispute exists. *Id.*; *Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. *Id.* at 248.

## V. ANALYSIS

"To establish an Eighth Amendment claim for deliberate indifference to serious medical needs, the plaintiff must show two elements: one objective and one subjective." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). "[T]he plaintiff must prove that he suffered from '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Giles*, 914 F.3d at 1049 (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

To establish the second element, a plaintiff must show that a defendant "knew of a substantial risk of harm to the inmate and disregarded the risk." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). A defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

A defendant may also be held liable if he or she was "aware of facts from which a reasonable inference could be drawn that [the plaintiff] was subjected to a substantial risk of serious harm, drew such an inference, and yet did not intervene." *Giles*, 914 F.3d at 1054.

### A.    Defendant LaTanya Williams

#### 1.    Denial of medical care claim

Defendant LaTanya Williams argues that she is entitled to summary judgment on Plaintiff's denial of medical care claim because she did not have knowledge that Plaintiff faced a

substantial risk of serious harm. In response, Plaintiff argues that he complained to Williams about leg and back pain but Williams "ignored his complaints about continued pain." (Pl.'s Resp. to Wexford Mot. 11.)

To survive summary judgment, Plaintiff must present evidence that Defendant Williams was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists." *Farmer*, 511 U.S. at 837. Plaintiff argues that "each time" he saw Williams, "he complained of pain, including pain to his leg" and that "[h]e complained at their first visit that, five months after the attack, he was urinating blood." (Pl.'s Resp. to Wexford Mot. 11.) In support of his argument that Williams was aware Plaintiff faced a substantial risk of serious harm, Plaintiff presents as evidence the following testimony from his deposition: "I told [Williams] that my leg and my back hurt, and I was urinating blood." (Pl.'s Dep. 76:22–24.)

Defendant Williams's awareness of the fact that Plaintiff was urinating blood could allow an inference that Plaintiff faced a substantial risk of serious harm. Regarding this symptom, however, Plaintiff has not presented any evidence that the blood in his urine (of unknown amount and unknown duration) is related to his leg and back pain or to some other underlying objectively serious condition. Plaintiff has not presented any evidence that Williams's failure to diagnose the origin of the blood in his urine or failure to treat the undiagnosed underlying condition caused him any harm. Williams cannot be held liable for failing to treat a symptom for which no evidence exists that the untreated symptom or its origin caused Plaintiff any harm. *See Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) ("No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury. For there is no tort—common

law, statutory, or constitutional—without an injury, actual or at least probabilistic."); *see also Roe v. Elyea*, 631 F.3d 843, 864 n.19 (7th Cir. 2011) (stating that under tort principles applicable in § 1983 actions, a plaintiff must show that he suffered an injury and that there is a causal connection between that injury and the defendant's unconstitutional conduct).

Regarding Plaintiff's testimony that he told Defendant Williams his leg and back "hurt," the Court finds that this is insufficient evidence to establish that Plaintiff alerted Williams to a substantial risk of serious harm. The word "hurt" can describe varying degrees of pain, and not "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez v. Peters*, 111 F.3d 1364, 1371–72 (7th Cir. 1997). Defendant Williams does not contest that Plaintiff's leg and back pain was an objectively serious condition. Nonetheless, to establish the subjective prong of the deliberate indifference standard, Plaintiff must present evidence that Williams was *aware* that Plaintiff was suffering from a sufficient level of pain that required further diagnosis or treatment.

Plaintiff points out that Defendant Williams had access to his medical records, which would have informed Williams that he previously complained of leg and back pain. Plaintiff cites to the portion of Williams's declaration where Williams documented her review of Plaintiff's medical records on the day of the attack. Those records show that on the day of the attack, Plaintiff complained of "headache, and back, stomach, and bilateral leg pain" and was seen by a physician who prescribed Tylenol and recommended that Plaintiff follow up as needed. A reasonable juror could conclude from this evidence that Williams was aware that Plaintiff had continuing complaints of pain five months after the attack. Even so, "pain" comes in varying degrees, and often, pain medication is the remedy.

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, Defendant Williams knew about Plaintiff's pain from his complaints and the medical records. To be held liable for deliberate indifference, however, Williams must have disregarded Plaintiff's pain. Plaintiff states, "Although I kept complaining that my leg was hurting and that I was having trouble walking and doing other things, [Williams] did not order an x-ray for my leg or do anything else to help me except prescribe me pain pills." (Pl.'s Decl. ¶ 7.) Since Williams is a medical professional, Plaintiff must present evidence that Williams's decision not to order an x-ray and to prescribe only pain medication was "a substantial departure from accepted professional judgment, practice, or standards." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)). Plaintiff has not presented any such evidence.

Plaintiff argues that Defendant Williams ignored his leg pain during the November 11, 2013, examination. During this visit, Williams told Plaintiff she would address only his back pain even though Plaintiff wanted Williams to address his leg pain. Williams ordered an x-ray of Plaintiff's lumbosacral spine, even though Plaintiff wanted an x-ray of his leg. Plaintiff, however, does not dispute that during this visit, Williams ordered pain medication, although Plaintiff says this was prescribed for his back pain, not his leg pain.

In the end, Plaintiff has not presented sufficient evidence that his complaints of leg pain or back pain alerted Defendant Williams to a medical condition that required anything more than pain medication or that prescribing only pain medication was a substantial departure from accepted professional standards. *See id.* Therefore, the Court finds that no reasonable juror could conclude that Defendant LaTanya Williams acted with deliberate indifference to Plaintiff's leg or back pain.

### 2. Failure to intervene in denial of medical care claim

Defendant LaTanya Williams argues that she is entitled to summary judgment on Plaintiff's failure to intervene claim because 1) Plaintiff has no evidence he was denied medical care, and 2) even assuming there was a denial of care, Plaintiff has no evidence Williams knew about it or had a realistic opportunity to prevent it. In response, Plaintiff argues that the evidence shows that Williams "fail[ed] to intervene when she knew that other medical staff were failing to provide [Plaintiff] with adequate medical care, particularly for his leg." (Pl.'s Resp. to Wexford Mot. 12.)

To hold Defendant Williams liable for failing to intervene, Plaintiff must present evidence that Williams was "aware of facts from which a reasonable inference could be drawn that [Plaintiff] was subjected to a substantial risk of serious harm, drew such an inference, and yet did not intervene." *Giles*, 914 F.3d at 1054. As discussed previously, the evidence shows that Plaintiff told Williams his leg and back "hurt" and that the medical records document Plaintiff's previous complaints of leg and back "pain." After examining Plaintiff, Williams prescribed pain medication. The Court finds that this is insufficient evidence to establish that Williams knew of a substantial risk of serious harm for which she failed to intervene.

### 3. Intentional infliction of emotional distress claim

Defendant LaTanya Williams argues that she is entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim because the record contains nothing supporting extreme and outrageous conduct by Williams causing Plaintiff to suffer emotional distress. Defendant Wexford, Inc. argues it cannot be held vicariously liable since Williams cannot be held liable. In response, Plaintiff argues Williams knew that Plaintiff "was

complaining about persistent pain, including leg pain, and completely ignored his requests for help." (Pl.'s Resp. to Wexford Mot. 13.)

To prevail on a claim of intentional infliction of emotional distress under Illinois law, a plaintiff must show that "(1) the defendants engaged in 'extreme and outrageous' conduct; (2) the defendants 'either intended that [their] conduct would inflict severe emotional distress, or knew there was a high probability that [their] conduct would cause severe emotional distress'; and (3) the defendants' 'conduct in fact caused severe emotional distress.'" *McGreal v. Village of Orland Park*, 850 F.3d 308, 314 (7th Cir. 2017) (quoting *Zoretic v. Darge*, 832 F.3d 639, 645 (7th Cir. 2016)).

The evidence shows that Defendant Williams prescribed pain medication for Plaintiff's pain. The Court finds that this is insufficient evidence to establish that Williams engaged in extreme and outrageous conduct. Therefore, the Court grants summary judgment in favor of Defendants LaTanya Williams and Wexford, Inc.

**B.      Defendant Obaisi**

**1.        Denial of medical care claim**

Plaintiff argues that Dr. Obaisi acted with deliberate indifference because Plaintiff "complain[ed] to [Dr. Obaisi] about [his] back and leg" and although Dr. Obaisi gave Plaintiff "medication" for his back, Dr. Obaisi ignored the complaints about his leg. (Pl.'s Resp. to Estate Mot. 7–8, ECF No. 162; Pl.'s Decl. ¶ 14.) Plaintiff also argues that the medical records would have alerted Dr. Obaisi to the fact "that the ibuprofen prescribed to [Plaintiff] was not effective, and that something more needed to be done to keep [Plaintiff] from being in pain . . . ." (Pl.'s Resp. to Estate Mot. 8.)

The Court finds that Plaintiff's testimony he "complain[ed] to" Dr. Obaisi about his back and leg is too vague for a reasonable juror to infer that Dr. Obaisi knew of a substantial risk of serious harm to Plaintiff. Moreover, the medical records show that when Plaintiff complained of pain, he was prescribed pain medication. Dr. Obaisi also gave Plaintiff "medication." Plaintiff has not presented any evidence to establish that he had a medical condition that required anything more than pain medication or that prescribing only pain medication was a substantial departure from accepted professional standards. *See Collignon*, 163 F.3d at 989; *see also Norwood v. Ghosh*, 723 F. App'x 357, 365 (7th Cir. 2018) ("[T]reating pain allows considerable room for professional judgment. Medical professionals cannot guarantee pain-free lives for their patients."). Therefore, the Court finds that no reasonable juror could conclude that Dr. Obaisi acted with deliberate indifference to Plaintiff's leg or back pain.

### 2.      Failure to intervene in denial of medical care claim

Plaintiff argues that Dr. Obaisi acted with deliberate indifference because Dr. Obaisi, as medical director, "fail[ed] to intervene when he knew that other medical staff were failing to provide [Plaintiff] with adequate medical care, particularly for his leg." (Pl.'s Resp. to Estate Mot. 8.) As just discussed, Plaintiff's medical records reveal that when Plaintiff complained of pain, he was given pain medication. Plaintiff has not presented any evidence to establish that this was inadequate medical care or that anything more than pain medication was necessary to treat Plaintiff's leg pain. Therefore, the Court finds that no reasonable juror could conclude that Dr. Obaisi acted with deliberate indifference by failing to intervene in the medical care provided for Plaintiff's leg or back pain.

### 3.     Intentional infliction of emotional distress claim

Plaintiff has not presented sufficient evidence to establish that Dr. Obaisi was made aware that anything more than pain medication was required to treat Plaintiff's leg and back pain. Therefore, the Court finds that no reasonable juror could conclude that Dr. Obaisi engaged in the kind of extreme and outrageous conduct necessary to establish a claim for intentional infliction of emotional distress.

## C.     IDOC Defendants

Before reaching the merits, IDOC Defendants first argue they are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies as to them. IDOC Defendants argue that Plaintiff's October 30, 2014, grievance regarding the lack of medical care at Pontiac "does not name or explain how any IDOC employee delayed or denied him access to healthcare." (IDOC Defs.' Mot. Summ. J. 7, ECF No. 156.) IDOC Defendants also argue that Plaintiff did not file a grievance regarding his medical care at Stateville. Plaintiff, however, presents evidence that he filed such a grievance on July 15, 2013. IDOC Defendants did not file a reply addressing this grievance.

The Prison Litigation Reform Act ("PLRA") bars prisoners from filing actions under federal law with respect to prison conditions "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal citation and quotation marks omitted).

The administrative process for resolving grievances of IDOC inmates is set forth in the Illinois Administrative Code. *See* 20 Ill. Admin. Code § 504.800 et seq. The regulations state that

an inmate's grievance must "contain factual details regarding each aspect of the [inmate's] complaint, including what happened, when, where, and the name of each person who is the subject of or who is otherwise involved in the complaint." *Id.* § 504.810(b). If an inmate does not know the name of any individual involved in the complaint, the inmate may still file a grievance, but he "must include as much descriptive information about the individual as possible." *Id.*

In his July 15, 2013, grievance filed at Stateville, Plaintiff wrote that he complained to "med tec Bobby" and "other unknown nurses" that he could barely walk and that it felt like his leg was broken, but they told Plaintiff that nothing was wrong with him. (Grievance, July 15, 2013.) In his October 30, 2014, grievance filed at Pontiac, Plaintiff wrote that he had sharp pains, that it felt like his leg was broken, and that he complained to "nurses and med tect" but they did not provide him medical care. (Grievance, Oct. 30, 2014.) The Court finds that Plaintiff's grievances contain sufficient factual details to exhaust his administrative remedies on the medical care claims against IDOC Defendants.

### 1.    Defendant Nagpal

Defendant Nagpal argues that he is entitled to summary judgment because he provided proper medical care to Plaintiff on the day of the attack and that thereafter, medical staff saw Plaintiff frequently and provided appropriate medical care. In response, Plaintiff argues that after the attack, he complained "almost every day" to Nagpal that he "was still in pain." (Pl.'s Decl. ¶ 6.) Plaintiff asked Nagpal to be placed on the sick call list and gave Nagpal sick call request forms, but Plaintiff "was very rarely taken to sick call." (*Id.*) After the attack on June 25, 2013, Plaintiff "was in serious pain" and had "constant pain" in his back and leg. (*Id.* ¶ 4.) Despite Plaintiff's requests to Nagpal to be seen on sick call, Plaintiff was not seen until July 17, 2013,

almost one month after the attack. Therefore, Plaintiff argues, Nagpal acted with deliberate indifference by delaying medical treatment for his ongoing pain.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff repeatedly complained to Defendant Nagpal about being in pain after the attack, yet Nagpal did nothing. Nagpal did not provide more pain medication and did not schedule Plaintiff to be seen at the HCU. Based on this evidence, the Court finds that a reasonable jury could conclude that Nagpal acted with deliberate indifference to Plaintiff's back and leg pain.

Plaintiff, however, has not presented any evidence that Defendant Nagpal failed to intervene in the denial of medical care by other medical staff. Therefore, the Court grants summary judgment in favor of Nagpal on Plaintiff's failure to intervene claim.

### 2.      Defendant Lemke

Plaintiff argues that Defendant Lemke "contributed to a delay in medical care for [Plaintiff] by failing to notify medical staff about [Plaintiff's] complaints." (Pl.'s Resp. to IDOC Mot. 19, ECF No. 164.) Plaintiff also argues that Lemke "failed to intervene to prevent others from denying [Plaintiff] medical care." (*Id.*) Plaintiff relies on his communications with Lemke as evidence to support his arguments.

First, Plaintiff states that approximately one or two weeks after the attack, he wrote at least two letters to Defendant Lemke and placed the letters in the institutional mail. (Pl.'s Dep. 148:1–149:8.) Plaintiff informed Lemke "about what happened to [him]" and that he "wasn't receiving medical attention." (*Id.* at 149:17–150:4.) "An inmate's correspondence to a prison administrator may . . . establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation." *Perez v. Fenoglio*, 792 F.3d 768, 781–82 (7th Cir. 2015). To establish adequate notice to the prison

official of an Eighth Amendment violation, a plaintiff "has the burden of demonstrating that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety.'" *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. at 837). The only evidence of the content of Plaintiff's letter was that Plaintiff told Lemke "what happened" and that he "wasn't receiving medical attention." (Pl.'s Dep. 149:17–150:4.) The Court finds that this is insufficient evidence for Plaintiff to meet his burden of demonstrating that his letters alerted Lemke to an excessive risk to Plaintiff's health or that medical staff was ignoring an excessive risk to Plaintiff's health for which Lemke needed to intervene.

Second, Plaintiff states that on an unknown date after he saw Defendant LaTanya Williams, Plaintiff saw Defendant Lemke in person and told Lemke that his back and leg was still in pain. (*Id.* at 151:22–152:17.) Lemke told Plaintiff that he would look into it. (*Id.*) Plaintiff states that he was not seen again by medical staff after he spoke with Lemke. (*Id.*) The medical records show that Plaintiff saw Williams on November 11, 2013, and December 11, 2013. Plaintiff does not dispute that he was seen by medical staff on April 15 and 24, 2014, for complaints of back pain. On May 7, 2014, Plaintiff transferred from Stateville to Pontiac. The evidence thus shows that Plaintiff was seen by medical staff after he was seen by Williams and that shortly thereafter Plaintiff was transferred to Pontiac. Without a known date for Plaintiff's conversation with Lemke, the Court is unable to assess whether Plaintiff was subjected to an unconstitutional delay in treatment.

For these reasons, the Court finds that no reasonable juror could conclude that Defendant Lemke contributed to a delay in Plaintiff's medical care or that Lemke failed to intervene to prevent others from denying Plaintiff medical care.

### 3.      Defendants Eschleman and Buczkowski

Plaintiff argues that Defendants Eschleman and Buczkowski acted with deliberate indifference because he repeatedly requested medical care from them but they ignored his complaints and failed to document what he was telling them. Plaintiff argues that this "contributed to [Plaintiff] waiting in pain by causing delay and by making it seem to other medical personnel later that [Plaintiff's] urgency was not as great as it actually was." (Pl.'s Resp. to IDOC Mot. 18.)

Plaintiff recalls one time when he collapsed on the floor of his cell because his "leg was not working and [he] could not move." (Pl.'s Decl. ¶ 12.) Defendant Buczkowski told Plaintiff she would put him on the sick call list for the next day, but the next day, Plaintiff was not taken to the HCU. Plaintiff recalls another time when Defendant Eschleman responded to complaints about his back and leg by shouting at Plaintiff from down the cellhouse that he did not need to complain to her every time about this, that she was not a doctor, and that he knew how to submit a health care slip.

"A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). However, a "minor delay in treatment" does not constitute deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010). "[W]hen assessing deliberate indifference claims, a delay in medical treatment 'is not a factor that is either always, or never, significant. Instead, the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.'" *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 555 (7th Cir. 2016) (quoting *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)).

In the present case, Plaintiff presents no evidence to establish when he complained to Defendant Eschleman or Buczkowski about his back and leg pain. The evidence shows that Plaintiff transferred to Pontiac on May 7, 2014. On May 14, 2014, medical staff saw Plaintiff for an initial consultation. On August 24, 2014, Plaintiff was seen on sick call for complaints of heartburn/indigestion. On November 16, 2014, Plaintiff saw Dr. Tilden, who ordered an x-ray of Plaintiff's leg. Plaintiff saw Dr. Tilden again on November 18 and December 18, 2014. Thereafter, Plaintiff was seen by medical staff on March 5, August 23, September 7, November 11, and December 30, 2015, and on January 4, February 4, 8, and 19, and June 7, 2016.

Without evidence of when Plaintiff complained to Defendants Eschleman and Buczkowski, the Court is unable to assess the length of the delay in providing Plaintiff medical care, and consequently, unable to assess whether Plaintiff has presented sufficient evidence of an unconstitutional delay.

Plaintiff also argues that Defendants Eschleman and Buczkowski should be held liable for failing to document Plaintiff's complaints because it "[made] it seem to other medical personnel later that [Plaintiff's] urgency was not as great as it actually was." (Pl.'s Resp. to IDOC Mot. 18.) Plaintiff, however, makes this argument in a conclusory fashion and does not offer any evidence to establish that the failure to document Plaintiff's complaints caused other medical personnel not to provide adequate treatment. Plaintiff has not identified any medical personnel who based his or her medical decision regarding how to treat Plaintiff's pain on the lack of a complete history of Plaintiff's complaints of pain.

Regarding Plaintiff's failure to intervene claim, Plaintiff has not presented sufficient evidence to establish that Defendant Eschleman or Buczkowski was "aware of facts from which

a reasonable inference could be drawn that [Plaintiff] was subjected to a substantial risk of serious harm, drew such an inference, and yet did not intervene." *Giles*, 914 F.3d at 1054.

For these reasons, the Court finds that no reasonable juror could conclude that Defendant Eschleman or Buczkowski acted with deliberate indifference to Plaintiff's leg or back pain or failed to intervene to prevent the denial of medical care.

### 4. Defendants Tarry Williams, Magana, Lemke, Brown-Reed, Calloway, Grennan, Kelley, and Pierce

The above-named Defendants, who are all wardens or assistant wardens, argue that nothing in the record exists to support an inference that they were personally involved in Plaintiff's alleged denial of medical care or that they failed to intervene on his behalf. In response, Plaintiff argues that Defendants are "liable because of their involvement as policymakers for the Illinois Department of Corrections." (Pl.'s Resp. to IDOC Mot. 19.) Plaintiff argues, "[O]ne reason medical care was delayed for [Plaintiff] was because of IDOC's policy of only allowing inmates to make a complaint about one medical issue at a time." (*Id.*) Plaintiff characterizes his claim against Defendants as a "*Monell* claim . . . [that] requires [Plaintiff] to demonstrate that the Illinois Department of Corrections, through its wardens, had a policy or widespread custom or practice that was the moving force behind a constitutional violation." (*Id.*)

In *Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978), the Supreme Court established that municipalities and other local government units are "persons" that can be sued for damages under § 1983. The *Monell* theory of liability has been extended to private corporations. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016). Neither the State of Illinois nor the IDOC, however, are "persons" within the meaning of § 1983 and therefore, cannot be sued for damages. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58,

71 (1989); *Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017) ("IDOC was properly dismissed because it is not a person subject to suit under § 1983.").

With the exception of Defendant Pierce, Plaintiff has sued the above-named Defendants in their individual capacities only. This, however, does not shield Defendants from being held liable for setting policy that causes a constitutional deprivation. An official's "involvement as a policy maker does not insulate him from personal liability for his *own* actions, even when making and enforcing policy." *Heard v. Tilden*, 809 F.3d 974, 981 (7th Cir. 2016) (emphasis in original) ("As the district court recognized, it would not serve [the plaintiff] to attribute [the defendant's] policy decisions to the Department of Corrections, since doing so would constitute an official-capacity theory that would not state a claim against the Department.").

Even so, "[f]or a defendant to be liable under section 1983, she must be personally responsible for the alleged deprivation of the plaintiff's constitutional rights." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). In the present case, Plaintiff does not present any evidence to establish that any of the above-named Defendants made or enforced the alleged policy of only allowing inmates to make a complaint about one medical issue at a time. Therefore, since no evidence exists that Defendants were personally involved in the alleged constitutional deprivation, the Court grants summary judgment to Defendants Tarry Williams, Magana, Lemke, Brown-Reed, Calloway, Grennan, Kelley, and Pierce, in his personal capacity, on Plaintiff's claim that IDOC policies caused a denial of medical care or caused others to fail to intervene in the denial of medical care.

### 5.      Defendant O'Brien

As previously discussed, Attorney Johnson moved to substitute as counsel for IDOC Defendants but not for Defendant O'Brien, and Johnson did not address the claims against O'Brien in IDOC Defendants' motion for summary judgment.

Defendant O'Brien was the assistant warden of programs at Stateville from 2012 to 2014. (Pl.'s 2d Am. Compl. ¶ 19, ECF No. 94.) Plaintiff sued O'Brien in her individual capacity. (*Id.*) As with the other wardens and assistant wardens, Plaintiff alleges that O'Brien was responsible for implementing IDOC policies that caused Plaintiff to be denied medical care. (*Id.* ¶¶ 63–66.) Since the Court has granted summary judgment to the other wardens and assistant wardens based on their lack of personal involvement, the Court now gives notice to Plaintiff that it will grant summary judgment to O'Brien thirty days from the date of this order for lack of personal involvement, unless Plaintiff presents evidence to establish otherwise. *See* Fed. R. Civ. P. 56(f)(1) ("After giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant."). Should Plaintiff respond, O'Brien has fourteen days to reply.

### 6.      Defendant Pierce

Defendant Pierce, who is the warden at Pontiac, argues he is entitled to summary judgment on the claims against him in his official capacity. Pierce argues that any claim for injunctive relief is moot now that Plaintiff is no longer housed at Pontiac and the likelihood of his being transferred back there amounts to mere speculation. In response, Plaintiff states that he is serving a sentence for which his current parole date is 2037 and that he will not be eligible to serve his sentence in a non-maximum security facility in IDOC for some time. Plaintiff argues that this means "there is every likelihood that a return trip to Pontiac is in his future at some point during the remainder of his sentence, particularly since his sentence up to this point has

been a series of transfers between Stateville, Menard and Pontiac." (Pl.'s Resp. to IDOC Mot. 21.) Pierce has not replied to Plaintiff's argument.

Given the remaining length of Plaintiff's sentence, it is possible that Plaintiff will be retransferred to Pontiac at some point in the future. However, an alternative ground exists for the Court to hold that Plaintiff's claim is not moot. Plaintiff alleges that the policy in question is not specific to Pontiac but rather, is a system-wide policy in IDOC. Plaintiff presents evidence that the policy exists at both Pontiac and Stateville, which is some evidence that the policy is a system-wide policy. "[Al]though a prison transfer might moot a claim for injunctive relief if the transfer means that the inmate no longer is laboring under the allegedly unconstitutional policy or practice," such is not the case where a plaintiff's "lawsuit challenges . . . a system-wide Department of Corrections policy that . . . will apply wherever [the plaintiff] is next sent until his release." *West v. Grams*, 607 F. App'x 561, 566 (7th Cir. 2015); *see also Lehn v. Holmes*, 364 F.3d 862, 872 (7th Cir. 2004) (stating that claim not mooted for "prisoner who seeks relief from a condition that stems from a system-wide policy, who is then transferred to a different facility within the same system where the objectionable policy also applies"). Therefore, the Court finds that Plaintiff's claim against Defendant Pierce in his official capacity is not moot.

Nonetheless, the Court would like further briefing on how the alleged policy—that inmates may only complain about one medical issue during a visit—was the proximate cause of the alleged delays in Plaintiff's medical care. *See* Fed. R. Civ. P. 56(f)(2) ("After giving notice and a reasonable time to respond, the court may . . . grant the motion [for summary judgment] on grounds not raised by a party."). For example, how many requests for medical care was Plaintiff allowed to submit at one time? When medical personnel told Plaintiff only one issue would be addressed during a visit, could Plaintiff submit another request the next day? If he could, did

Plaintiff submit such a request? The Court gives notice to Plaintiff that it will grant summary judgment to Defendant Pierce thirty days from the date of this order for lack of causation, unless Plaintiff presents evidence to establish otherwise. Should Plaintiff respond, Pierce has fourteen days to reply.

**IT IS THEREFORE ORDERED:**

1) **Wexford Defendants' motion to strike [170] is DENIED.**

2) **Wexford Defendants' motion for summary judgment [155] is GRANTED.**

3) **Estate Defendant's motion for summary judgment [157] is GRANTED.**

4) **IDOC Defendants' motion for summary judgment [156] is GRANTED in part, DENIED in part, and RESERVED in part. The Court grants summary judgment to Defendants Lemke, Eschleman, Buczkowski, Tarry Williams, Magana, Brown-Reed, Calloway, Grennan, Kelley, and Pierce, in his personal capacity, on Plaintiff's claims of denial of medical care and failure to intervene in the denial of medical care. The Court grants summary judgment to Defendant Nagpal on Plaintiff's claim of failure to intervene in the denial of medical care and denies summary judgment to Nagpal on Plaintiff's claim of denial of medical care. The Court reserves ruling on Defendant Pierce's motion for summary judgment in his official capacity. The Court will grant summary judgment to Pierce thirty days from the date of this order for lack of causation, unless Plaintiff presents evidence to establish otherwise. Should Plaintiff respond, Pierce has fourteen days to reply.**

5) **Attorney Johnson is directed to advise the Court, within fourteen days, of the status of Defendant O'Brien's representation.**

6) **The Court will grant summary judgment to Defendant O'Brien thirty days from the date of this order for lack of personal involvement, unless Plaintiff presents evidence to establish otherwise. Should Plaintiff respond, O'Brien has fourteen days to reply.**

7) **The following claims remain for trial: (a) denial of medical care against Defendant Nagpal; (b) failure to protect against Defendants McGarvey, Durrett, Malkowski, and Griffin; (c) failure to intervene against Defendants McGarvey, Durrett, Malkowski, and Griffin; and (d) intentional infliction of emotional distress against Defendants McGarvey, Durrett, Malkowski, and Nagpal. Plaintiff also seeks to enforce the State's obligation to indemnify IDOC Defendants or pay any judgments against them. The Court's rulings on the claims against Defendant O'Brien and Defendant Pierce in his official capacity are pending.**

8)  **The Clerk of Court is directed to correct the spelling of Defendants' names on the docket as follows: Cyndi Garcia should be Cynthia Garcia, Latonya Williams should be LaTanya Williams, Royce Brown Reed should be Royce Brown-Reed, A. W. Calloway should be Victor Calloway, McGarvey should be Jenny McGarvey, Tralon Durett should be Tralon Durrett, Kimberly Kelly should be Kimberly Kelley, Kristi Eschleman should be Krisi Eschleman, and Becky Buczowski should be Rebecca Buczkowski.**

9)  **The Clerk of Court is directed to terminate Defendants Major Magarvie, Medtec Bobby, Medical Technician Bobby, Mr. Johnson, Correctional Officer John Doe 1, Jane Roe, Unknown Wexford Health Sources, Inc. Employees, Unknown Health Care Employees, Unknown Illinois Department of Corrections Employees, Cynthia Garcia, Meghan Foley, LaTanya Williams, Wexford Health Sources, Inc., Ghaliah Obaisi, Michael Lemke, Krisi Eschleman, Rebecca Buczkowski, Tarry Williams, Michael Magana, Royce Brown-Reed, Victor Calloway, Mary Ellen Grennan, and Kimberly Kelley as parties to this case.**

Entered this 26th day of March 2019.


_____ s/ James E. Shadid _____
JAMES E. SHADID
UNITED STATES DISTRICT JUDGE